**FILED**
U.S. Bankruptcy Appellate
Panel of the Tenth Circuit

**December 26, 2024**

**Anne M. Zoltani**
Clerk

**PUBLISH**

# UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE TENTH CIRCUIT

_____

IN RE FRONTLINE MEDICAL
SERVICES LLC,

Debtor.

_____

BUSCH LAW FIRM, LLC,

Appellant,

v.

FRONTLINE MEDICAL SERVICES
LLC,

Appellee.

BAP No. CO-24-008

Bankr. No. 22-13411
Chapter 11

OPINION

_____

Appeal from the United States Bankruptcy Court

For the District of Colorado

_____

Chad S. Caby of Lewis Roca Rothgerber Christie LLP, Denver, Colorado for Appellant.

Steven Mulligan of Coan, Payton & Payne, LLC, Denver, Colorado for Appellee.

_____

Before **LOYD**, **PARKER**, AND **THURMAN**, Bankruptcy Judges.

**LOYD**, Bankruptcy Judge.

While attorney-client relationships are oftentimes mutually rewarding, not every such relationship goes swimmingly. This is an example of one that went awry. A law firm was retained by a medical equipment company to assist it in resolving a contract

dispute it had with a government healthcare provider. Over the course of representing the medical equipment company, the law firm's invoicing was sporadic. At one point, the firm sent the company an invoice covering nearly nine months. The company complained and a bitter dispute erupted. The law firm terminated its representation and sought to recover its fees through a breach of contract lawsuit in state court. While the state court lawsuit was pending, the company filed for bankruptcy.

The litigation morass continued. The company filed its plan of reorganization and the law firm objected. The law firm moved to dismiss the bankruptcy case and the company objected. The Bankruptcy Court denied the dismissal motion and confirmed the plan. This appeal ensued.

For the reasons that follow, we affirm the Bankruptcy Court's determination that the company exhibited no bad faith in the filing of the bankruptcy case and the denial of the motion to dismiss.  However, because the Bankruptcy Court did not apply the correct legal standard to determine feasibility for a nonconsensual subchapter V plan, we must remand that issue to the Bankruptcy Court for further proceedings consistent with this opinion.

## I.      Background

### A.  The Dispute

Steven Dumler, a service-disabled United States Army veteran, owned and operated Frontline Medical Services LLC ("Frontline"), a wholesale distributor of durable medical equipment. Dumler and his wife Lori purchased Frontline in October 2013 for $320,000 using some of their own money and borrowing $260,000 from Castle

Rock Bank (the "Loan"). The following year, Lori Dumler's parents loaned Frontline $150,000 to pay down the Loan, as evidenced by a promissory note dated May 30, 2014.[1] Approximately $32,000 remains due on the Loan.

Frontline is certified as a Service-Disabled, Veteran-Owned Small Business, which provides it with an advantage to receive government contracts from the Veteran's Administration ("VA") and other government healthcare providers. Over the years, the company operated under several different contracts with the VA. Frontline was profitable in 2018 and 2019, but its profits were substantially affected in 2020 due to the COVID-19 pandemic—VA locations were closed, and durable medical equipment orders were not placed.

In October 2020, Frontline received notice that the VA was partially terminating a contract because several line items had been awarded to it in error (the "Terminated Contract"). The notice indicated the partial termination was effective immediately and a formal termination notification would follow.

In response, Frontline retained Appellant Busch Law Firm to represent it in resolving the Terminated Contract issue (the "VA Dispute") pursuant to an engagement letter dated October 16, 2020 (the "Engagement Letter"). The Engagement Letter provided Mr. Richard F. Busch II would be the primary attorney and included the following terms: (i) Mr. Busch's hourly rate was $400, (ii) Appellant would provide monthly statements, payment due upon receipt, and (iii) Frontline would pay an initial

---

[1] The record reflects that the promissory note was not signed by the parties. *See* Appellant's App. at 4060-4061.

3

retainer of $10,000.[2] Frontline paid the retainer and Appellant proceeded to represent Frontline in the VA Dispute.

Mr. Busch experienced health issues while representing Frontline in the VA Dispute; nevertheless, he continued to work on Frontline's behalf. Despite the terms of the Engagement Letter, he did not provide monthly billing statements and invoices to Frontline. In December 2020, Appellant sent an invoice covering the two preceding months for a total of $23,800 but indicated it would apply the $10,000 retainer toward the bill. Because a balance of $13,800 remained, Appellant requested an additional $10,000 retainer. Frontline acquiesced and covered the total $23,800 charge.

In January 2021, Frontline received another notice from the VA about the Terminated Contract to formalize the notice originally sent. It stated that "[t]his action is being taken because it came to the Government's attention that your offer was not the best value to the Government."[3] Mr. Dumler forwarded this notice to Appellant.

In April 2021, Appellant sent Frontline an invoice for December 2020 in the amount of $24,600. Appellant again applied the $10,000 retainer and requested the remaining balance. Frontline paid the total amount due.

Later that month, Appellant sent Frontline yet another invoice, this time for $20,700 covering January 2021. Mr. Busch stated in the accompanying letter that he

---

[2] Engagement Letter, *in* Appellant's App. at 2565-2566.
[3] Letter, *in* Appellant's App. at 4331.

4

would defer $5,700 "as a professional courtesy due to the VA's Bad Faith approach to these issues."[4] Frontline paid Appellant the $15,000 balance.

Frontline did not receive another invoice until October 2021, when Appellant sent one for $125,600 covering nearly nine months—February 2021 through October 4, 2021 (the "October 4 Invoice").[5] Appellant requested immediate payment of $125,600 and agreed to collect the deferred amount of $75,980 "at the conclusion of the administrative matter via settlement negotiations or litigation."[6] A rather heated exchange followed. Mr. Dumler sent Appellant an email expressing that Frontline was "caught off guard" by the October 4 Invoice and concerned whether the attorney's fees would be reimbursed by the government.[7] He offered to pay $25,000 immediately and work with Appellant until the balance was paid. Appellant responded that Frontline had never before questioned the approach taken or time expended and had accepted eight months of Appellant's work without payment or concern. Frontline then paid Appellant $27,000 "in an act of good faith."[8]

---

[4] E-mail from Appellant to Steve and Lori Dumler (Apr. 24, 2021), *in* Appellant's App. at 4370.

[5] *Summary of Legal Fees*, *in* Appellant's App. at 2597. This exhibit includes a breakdown of the legal fees by month, beginning in October 2020.

[6] *Id.*

[7] E-mail from Steve Dumler to Appellant (Oct. 15, 2021), *in* Appellant's App. at 3225.

[8] E-mail from Steve Dumler to Appellant (Nov. 3, 2021), *in* Appellant's App. at 2754. In subsequent correspondence, Dumler complains about the untimeliness and content of the invoices, and requests that Appellant provide itemized time entries with detailed task descriptions for all bills that had been submitted.

In late October 2021, Mr. Dumler submitted a settlement proposal to the VA on behalf of Frontline (the "Settlement Proposal") to resolve the VA Dispute. The Settlement Proposal had been prepared by Appellant and included Appellant's legal fees totaling $264,980 in the cost summary.[9] In November 2021, Frontline received a letter from the VA rejecting the Settlement Proposal's reasoning and legal theories and criticizing the amounts requested, including the anticipatory profits and legal fees.[10]

Frontline then hired new counsel, the Gardner Law Firm ("Gardner"), to appeal the VA's decision. Gardner negotiated a resolution, and the appeal was dismissed without prejudice. Frontline has received nothing from the VA related to this matter.

In December 2021, Appellant terminated its engagement with Frontline and began efforts to recover its fees. Although the Engagement Letter required the parties to engage in mediation to resolve fee disputes, no mediation took place because the parties were unable to agree on a mediator.

In May of 2022, Appellant filed a lawsuit in state court against Frontline asserting breach of contract claims, and alternatively, seeking equitable relief (the "State Court Litigation"). Frontline filed five counterclaims; Appellant moved to dismiss four of them. While the motion to dismiss was pending, on September 6, 2022, Frontline filed a petition for chapter 11 bankruptcy relief, electing to proceed under subchapter V.

---

[9] *Cost Summary*, *in* Appellant's App. at 2657.
[10] Letter, *in* Appellant's App. at 3353-3365. The VA did allow $6,480 for certain marketing costs but denied the remaining value of the claim.

*B. The Bankruptcy*

Immediately following Frontline's bankruptcy filing, Appellant sought relief from the automatic stay to proceed with the State Court Litigation. The Bankruptcy Court denied Appellant's request. Subsequently, Frontline filed its *Subchapter V Plan of Reorganization* (the "Plan"). Appellant objected. On January 13, 2023, Appellant filed its *Motion to Dismiss Case Pursuant to § 1112(b)* (the "Motion to Dismiss") arguing (1) Frontline's bad faith constitutes cause for dismissal or conversion, and (2) dismissal rather than conversion is appropriate because this case involves a two-party dispute.[11] Frontline amended the Plan on March 20, 2023, and again on March 29, 2023, to which Appellant objected on several grounds, including that Appellant had not proposed the Plan in good faith and the Plan failed to meet the requirements of §§ 1129 and 1191.[12] The Bankruptcy Court held an evidentiary hearing on both the Motion to Dismiss and plan confirmation.[13] On February 20, 2024, the Bankruptcy Court denied the Motion to Dismiss and confirmed the Plan (the "Order").[14] This appeal followed.

## II. Jurisdiction

The Tenth Circuit Bankruptcy Appellate Panel has jurisdiction to hear timely filed appeals from "final judgments, orders, and decrees" of bankruptcy courts within the

---

[11] The only impaired unsecured claimants listed in the Plan are Appellant and Mr. Hamilton (Lori Dumler's father).

[12] Unless otherwise specified, references to "section" and "§" are to sections of title 11 of the United States Code.

[13] The Bankruptcy Court heard testimony from two witnesses: Steve Dumler and attorney Robert Gardner.

[14] *Findings of Fact and Conclusions of Law* and *Order and Judgment*, *in* Appellant's App. at 2149-2169.

Tenth Circuit, unless a party timely elects to have the district court hear the appeal.[15] The Order was a final appealable order, and the appeal was timely filed. No party has elected to have the district court hear the appeal. Accordingly, this Court has jurisdiction to hear and decide this appeal.

### III.     Statement of Issues and Standards of Review

#### A. The Issues on Appeal

Appellant submits nine issues on appeal.[16] Based on Appellant's arguments, we have distilled the issues on appeal as follows:

1.  Did the Bankruptcy Court clearly err in concluding Frontline did not exhibit bad faith?

---

[15] 28 U.S.C. § 158(a)(1), (b)(1), and (c)(1); Fed. R. Bankr. P. 8003, 8005.

[16] "1. Whether the Court erred by refusing to dismiss Frontline's bankruptcy case under 11 U.S.C. § 1112(b) and for "cause" under 11 U.S.C. § 1112(b)(4)?
    2. Whether the Court erred by refusing to dismiss Frontline's bankruptcy case for Frontline's bad faith, including, but not limited to both Frontline's pre- and postpetition bad faith?
    3. Whether the Court erred by refusing to dismiss Frontline's bankruptcy case because the bankruptcy case was filed for an improper purpose and is a two-party dispute?
    4. Whether the Court erred by refusing to dismiss Frontline's bankruptcy case because of Frontline's unclean hands and violation of federal law, including, but not limited to claims under the False Claims Act?
    5. Whether the Court erred in confirming Frontline's subchapter V plan under 11 U.S.C. §§ 1129(a) and (b); 1191(a)–(d) of the Bankruptcy Code?
    6. Whether the Court erred in confirming Frontline's subchapter V plan because Frontline's subchapter V plan was not proposed in good faith?
    7. Whether the Court erred in confirming Frontline's subchapter V plan because the plan was not feasible?
    8. Whether the Court erred in confirming Frontline's subchapter V plan because the plan was not fair and equitable under subchapter V?
    9. Whether the Court erred in confirming Frontline's subchapter V plan when Frontline had not complied with applicable federal law?" Appellant's Opening Br. 2-6. Appellant lists nine sub-issues under this last issue but they are either duplicative or constitute arguments in support of this issue rather than true sub-issues.

2. Did the Bankruptcy Court abuse its discretion by denying the Motion to Dismiss?

3. Did the Bankruptcy Court err in confirming the Plan?

     a. Did the Bankruptcy Court apply the correct the legal standard?

     b. Assuming the Bankruptcy Court applied the correct legal standard, did the Bankruptcy Court clearly err in concluding the Plan was feasible?

     c. Did the Bankruptcy Court clearly err in concluding Frontline proposed the Plan in good faith?

### B. The Standards of Review

We review whether a debtor has filed a bankruptcy petition in bad faith for clear error.[17] Likewise, we review whether a debtor proposed a plan in good faith for clear error.[18] "A finding of fact is clearly erroneous if it is without factual support in the record or if, after reviewing all the evidence, [the reviewing court is] left with the definite and firm conviction that a mistake has been made."[19]

We review whether cause existed to dismiss a bankruptcy case for abuse of discretion.[20] Under the abuse of discretion standard, this Court will not disturb a bankruptcy court's decision unless it "has a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the

---

[17] *In re Gier*, 986 F.2d 1326, 1329 (10th Cir. 1993) (citing *In re Love*, 957 F.2d 1350, 1354 (7th Cir. 1992)).

[18] *In re Alexander*, 363 B.R. 917, 924 (10th Cir. BAP 2007) (citing *In re Robinson*, 987 F.2d 665, 668 (10th Cir. 1993)).

[19] *In re Inv. Co. of the Sw., Inc.*, 341 B.R. 298, 310 (10th Cir. BAP 2006) (quoting *In re Miniscribe Corp.*, 309 F.3d 1234, 1240 (10th Cir. 2002)).

[20] *Hall v. Vance*, 887 F.2d 1041, 1044 (10th Cir. 1989) ("The bankruptcy court has broad discretion under § 1112(b).").

circumstances."[21] Put another way, an abuse of discretion occurs when "the [trial] court's decision is 'arbitrary, capricious or whimsical,' or results in a 'manifestly unreasonable judgment.'"[22]

We review the bankruptcy court's conclusions of law de novo and factual findings for clear error.[23] In the context of plan confirmation, a bankruptcy court's feasibility determination is a factual finding, and thus is generally subject to the clearly erroneous standard of review.[24] However, when a trial court's factual finding is predicated on legal error, an appellate court conducts a de novo review of the trial court's understanding of the governing law.[25] "De novo review requires an independent determination of the issues, giving no special weight to the bankruptcy court's

---

[21] *In re Arenas*, 535 B.R. 845, 849 (10th Cir. BAP 2015) (quoting *Moothart v. Bell*, 21 F.3d 1499, 1504 (10th Cir. 1994)).

[22] *Moothart*, 21 F.3d at 1504-05 (quoting *United States v. Wright*, 826 F.2d 938, 943 (10th Cir. 1987)). *See also Jackson v. Los Lunas Cmty. Program*, 880 F.3d 1176, 1191 (10th Cir. 2018) (quoting *Ohlander v. Larson*, 114 F.3d 1531, 1537 (10th Cir. 1997)) ("A clear example of an abuse of discretion exists where the trial court fails to consider the applicable legal standard or the facts upon which the exercise of its discretionary judgment is based.").

[23] *In re Miller*, 288 B.R. 879, 881 (10th Cir. BAP 2003).

[24] *In re Inv. Co. of the Sw., Inc.*, 341 B.R. 298, 310 (10th Cir. BAP 2006) ("Whether a plan is feasible is a question of fact, subject to the clearly erroneous standard on appeal from an order confirming the plan.").

[25] *In re Woods*, 743 F.3d 689, 693 n.1 (10th Cir. 2014) (applying "de novo review here to the bankruptcy court's tacit legal assessment of the statutory requirements" of the relevant statute) (citing *Stephens v. Stephens* (*In re Stephens*), 704 F.3d 1279, 1283 (10th Cir. 2013)).

10

decision."[26] Accordingly, we give no deference to the Bankruptcy Court's decision but apply the same standard as the Bankruptcy Court.[27]

## IV. Analysis

### A. The Bankruptcy Court did not clearly err in concluding Frontline did not exhibit bad faith in filing its petition.

The term "bad faith" is not defined in the Bankruptcy Code. The Tenth Circuit analyzes whether a debtor filed for relief in good faith by considering the following nonexclusive list of factors from *In re Laguna Associates Ltd. Partnership* (the "*Laguna Factor(s)*"):[28]

(1) the debtor has one asset;

(2) the pre-petition conduct of the debtor has been improper;

(3) there are only a few unsecured creditors;

(4) the debtor's property has been posted for foreclosure, and the debtor has been unsuccessful in defending against the foreclosure in state court;

(5) the debtor and one creditor have proceeded to a standstill in state court litigation, and the debtor has lost or has been required to post a bond which it cannot afford;

(6) the filing of the petition effectively allows the debtor to evade court orders;

(7) the debtor has no ongoing business or employees; and

---

[26] *In re Liehr*, 439 B.R. 179, 182 (10th Cir. BAP 2010) (citing *Salve Regina Coll. v. Russell*, 499 U.S. 225, 238 (1991)).

[27] *Carlile v. Reliance Standard Life Ins. Co.*, 988 F.3d 1217, 1221 (10th Cir. 2021).

[28] *In re Nursery Land Dev., Inc.*, 91 F.3d 1414, 1416 (10th Cir. 1996) (citing *In re Laguna Assocs. Ltd. P'ship*, 30 F.3d 734, 738 (6th Cir. 1994), *as amended on denial of reh'g and reh'g en banc* (Sept. 9, 1994)).

11

(8) the lack of possibility of reorganization.

In the Order, the Bankruptcy Court discussed each *Laguna* Factor in turn and determined the evidence did not support a finding of bad faith:

(1) Frontline has more than one asset;

(2) Frontline's submission of the Settlement Proposal to the VA and subsequent dispute of the attorney's fees contained therein did not constitute improper prepetition conduct because Appellant did not establish Frontline had knowledge the fees were improperly submitted to the VA for payment;

(3) the low number of unsecured creditors was justified because Frontline's business model does not require it to acquire debt in the ordinary course of business;

(4) Frontline was not facing foreclosure;

(5) there was no standstill in the State Court Litigation and Frontline had not lost;

(6) Frontline had not evaded any court orders;

(7) Frontline has an ongoing business, has cash flow sufficient to pay its operating expenses, and expects to hire employees in the future; and

(8) Frontline has shown a likelihood of reorganization.[29]

The Bankruptcy Court concluded "Frontline filed its petition for the proper bankruptcy purpose of reorganizing an operating business that was unable to pay substantial, unanticipated expenses for legal fees."[30]

---

[29] Order, *in* Appellant's App. at 2164-2165.

[30] *Id.* at 2166.

12

The Bankruptcy Court only briefly addressed Frontline's good faith in proposing the Plan and, based on its bad faith analysis regarding dismissal, did "not find Frontline's dealings with the Law Firm or the VA support a conclusion of bad faith."[31]

The main argument advanced by Appellant is that this case is purely a two-party dispute that Frontline filed as a litigation tactic to gain advantage over the Appellant.[32] Specifically, Appellant asserts Frontline filed bankruptcy "to avoid an adverse ruling by the State Court in order to exert pressure on Appellant, to avoid paying the full amount of the state law claim, and to avoid revealing its false claims and misconduct to the VA."[33] Appellant continues, "the two-party nature of this dispute is key to the factual inquiry of bad faith" and the Bankruptcy Court completely failed to acknowledge Appellant's briefing on this aspect and consider Appellant's arguments.[34]

Appellant contends further that, in not finding Frontline exhibited bad faith, the Bankruptcy Court largely ignored (i) Frontline's unauthorized postpetition payments to

---

[31] *Id.*

[32] Appellant relies heavily on *In re Asanda Air II LLC*, 600 B.R. 714 (Bankr. N.D. Ga. 2019) to support its position that a bankruptcy filing involving a two-party dispute constitutes bad faith. In that case, however, the court found the debtor acted in bad faith because the filing involved a two-party dispute *and* the debtor failed to make several material disclosures and there was a lack of unsecured creditors and the debtor failed to provide documentation regarding a tax debt. The two-party dispute aspect was simply one factor considered in the court's analysis.

[33] Appellant's Opening Br. 26-27.

[34] *Id*. at 18, 27. Despite Appellant's argument to the contrary, the Bankruptcy Court did address the fact that this bankruptcy case was primarily a two-party dispute—albeit indirectly—when it considered whether "the debtor and one creditor have proceeded to a standstill in state court litigation." Appellant admits that certain of the *Laguna* Factors (i.e., nos. 3, 5, and 6) overlap with the two-party dispute issue. Appellant's Opening Br. 22 n. 4.

its State Court attorneys, (ii) Frontline's unique statutory and contractual duties as a government contractor, (iii) Frontline's record of inconsistent statements, and (iv) Frontline's ability at any time to submit a "Standard Form 30" to the VA for reimbursement of its legal fees which would have extinguished the need for the bankruptcy case.[35] In short, Appellant contends "the totality of [Frontline's] conduct establishes a pattern and practice of bad faith gamesmanship."[36]

Frontline contends it filed its bankruptcy case for the purpose of reorganizing the business, pointing to the Bankruptcy Court's finding to that effect. It rebuts Appellant's argument that this is a two-party dispute by asserting it has three unsecured creditors: Appellant, Delmer Hamilton, and Ruth Hamilton. Frontline also asserts Appellant's claim has been allowed in full, which precludes any need for Appellant to pursue the State Court Litigation further. In response to Appellant's accusation that Frontline failed to notify the VA of its bankruptcy, Frontline contends that he spoke to the contracting officers and emailed a notice of the bankruptcy to them. Finally, Frontline asserts Appellant never advised it that by submitting the claim to the VA, it was impliedly certifying that the amount of legal fees was accurate—it could not be deemed a false claim because Frontline did not know what it submitted to the government was wrong.[37] The crux of Frontline's position is the Bankruptcy Court did not commit clear error since

---

[35] *Id*. at 47.
[36] *Id*. at 58.
[37] *Transcript of Evidentiary Hearing*, *in* Appellant's App. at 5127.

14

it addressed the *Laguna* Factors and the evidence presented to determine Frontline did not act in bad faith.

Based on the record, we agree that the Bankruptcy Court committed no clear error in finding that Frontline did not file its case in bad faith. The Bankruptcy Court thoroughly analyzed each of the *Laguna* Factors as they applied to the facts established in the record regarding Frontline's prepetition and postpetition conduct. The evidence supports its conclusion that Frontline filed its bankruptcy petition for the legitimate purpose of reorganizing an ongoing business and proposed its Plan in good faith. This Court is not left with the definite and firm conviction that the Bankruptcy Court made a mistake regarding this issue.

### B. The Bankruptcy Court did not abuse its discretion by denying the Motion to Dismiss.

Under 11 U.S.C. § 1112(b)(1), dismissal or conversion must be at the request of a party, after notice and a hearing, and for cause. The burden of proof to show cause for dismissal rests on the movant by a preponderance of the evidence.[38] The term "cause" includes sixteen enumerated grounds upon which a bankruptcy court may dismiss a chapter 11 case or convert it into a case under chapter 7.[39] This list is illustrative, not exhaustive.[40] Although not included as cause under § 1112(b)(4), courts in the Tenth Circuit have overwhelmingly found that bad faith in filing a chapter 11 petition may

---

[38] *In re Whetten*, 473 B.R. 380, 382 (Bankr. D. Colo. 2012).
[39] 11 U.S.C. § 1112(b)(4).
[40] *In re Autterson*, 547 B.R. 372, 409 (Bankr. D. Colo. 2016).

15

constitute cause for dismissal.[41] In other words, "a Chapter 11 petition must be filed in good faith, and if not, dismissal is an appropriate remedy."[42]

Individual factors, alone, may not lead to a conclusion that a bankruptcy filing is in bad faith.[43] Rather, the court must look at the totality of the circumstances and determine if the cumulative effect of the relevant factors gives rise to an inescapable conclusion that use of the bankruptcy process by the debtor is inappropriate.[44] The fact that a bankruptcy case involves a two-party dispute is not necessarily grounds for dismissal based on bad faith. It is simply one factor considered by the court in determining whether dismissal is warranted.[45]

In deciding the Motion to Dismiss, the Bankruptcy Court addressed each of the *Laguna* Factors and applied them to the circumstances of the case, including Frontline's

---

[41] *See, e.g.*, *Muth v. Muth (In re Muth)*, Nos. CO-13-055, 514 B.R. 719, at *5 (10th Cir. BAP 2014); *In re RHA Stroud, Inc.*, No. 20-13482-SAH, 2020 WL 7787034, at *12 (Bankr. W.D. Okla. Dec. 30, 2020) (unpublished); *In re eFusion Servs., LLC*, No. 13-30740 MER, 2014 WL 5293415, at *2 (Bankr. D. Colo. Oct. 16, 2014) (unpublished); *In re Hyatt*, 479 B.R. 880, 883 (Bankr. D.N.M. 2012).

[42] *In re Reg'l Evangelical All. of Churches, Inc.*, 592 B.R. 375, 384 (Bankr. D. Kan. 2018) (citations omitted).

[43] *In re RHA Stroud, Inc.*, 2020 WL 7787034, at *13 (no single factor is determinative).

[44] *Id.* (citing *In re eFusion Servs., LLC*, 2014 WL 5293415, at *2).

[45] *See In re Hyatt*, 479 B.R. at 892 ("although the dispute that is the basis for this chapter 11 case is largely though not entirely a two-party dispute, that is not a sufficient basis by itself for dismissing or converting the case"); *In re Cedar Shore Resort, Inc.*, 235 F.3d 375 (8th Cir. 2000) (determining bankruptcy court did not abuse its discretion in dismissing debtor's petition on bad faith grounds where court did not base dismissal on a finding that the parties were involved in a two-party dispute, but indicated that this circumstance existed in addition to others indicating bad faith); *In re Ladouceur*, No. 16-17125-JGR, 2017 WL 5054307, at *5 (Bankr. D. Colo. Nov. 2, 2017) (unpublished) (concluding reason for bankruptcy, a two-party dispute between debtor and bank creditor,

16

business structure, its history of promptly paying its obligations, and its dealings with the VA. The Bankruptcy Court did not find Frontline filed its petition in bad faith and concluded Appellant had not met its burden of establishing cause for dismissal.

Appellant does not delineate its bad faith arguments as to Frontline's bad faith in filing the petition and proposing the Plan.[46] Rather Appellant simply asserts Frontline's prepetition and postpetition conduct demonstrated bad faith, which constitutes cause for purposes of dismissal under § 1112(b)(1). Because we concluded the Bankruptcy Court did not clearly err in determining Frontline did not act in bad faith, and bad faith was the cornerstone of the Motion to Dismiss, this Court cannot find that the Bankruptcy Court made a clear error of judgment or exceeded the bounds of permissible choice. Thus, we conclude the Bankruptcy Court did not abuse its discretion by denying the Motion to Dismiss.

### C. The Bankruptcy Court erred in confirming the Plan by concluding the Plan was feasible under the incorrect legal standard.

Section 1191 governs the confirmation of a subchapter V plan of reorganization. When no class of claims or interests votes to reject the plan, it is considered consensual and § 1191(a) applies: a bankruptcy court "shall confirm a plan under this subchapter only if all the requirements of section 1129(a), other than paragraph (15) of that section,

---

was just one factor of many in totality of circumstances analysis to determine cause for dismissal).

[46] Neither Appellant nor Frontline makes that distinction. Given the analysis of the Motion to Dismiss relies heavily on the bad faith analysis, our discussion here will not include the parties' previous contentions and focuses instead on elements specific to § 1112(b).

of this title are met." However, if a class of claims or interests votes to reject the proposed plan, the plan is nonconsensual and governed by § 1191(b), which requires plan confirmation if all of the requirements of § 1129 of this title, other than paragraphs (8), (10), and (15) of that section, are met and the plan "does not discriminate unfairly, and is fair and equitable with respect to" that class of claims or interests, and § 1191(c), which defines when a plan is fair and equitable. In other words, if a plan is nonconsensual, the bankruptcy court must find that the plan passes the feasibility test of § 1191(c)(3).

Under § 1191(c), a nonconsensual plan is fair and equitable if the bankruptcy court finds:

> (1) With respect to a class of secured claims, the plan meets the requirements of section 1129(b)(2)(A) of this title.
>
> (2) As of the effective date of the plan—
>
> > (A) the plan provides that all of the projected disposable income of the debtor to be received in the 3-year period, or such longer period not to exceed 5 years as the court may fix, beginning on the date that the first payment is due under the plan will be applied to make payments under the plan; or
> >
> > (B) the value of the property to be distributed under the plan in the 3-year period, or such longer period not to exceed 5 years as the court may fix, beginning on the date on which the first distribution is due under the plan is not less than the projected disposable income of the debtor.
>
> (3)(A) The debtor will be able to make all payments under the plan; or
>
> > (B)(i) there is a reasonable likelihood that the debtor will be able to make all payments under the plan; and

18

> (ii) the plan provides appropriate remedies, which may include the liquidation of nonexempt assets, to protect the holders of claims or interests in the event that the payments are not made.[47]

Section 1191(c)(3) is commonly referred to as the feasibility test.[48]

In the Order, the Bankruptcy Court engaged in an analysis of § 1129(a), addressing each of the requirements set forth in that section. As to feasibility, the Bankruptcy Court found that under § 1129(a)(11), "Frontline ha[d] satisfied its burden of proving confirmation of its plan is not likely to be followed by its liquidation or the need for further financial reorganization."[49] Next, citing § 1191(c)(2), the Bankruptcy Court articulated the following standard to determine whether the Plan was fair and equitable:

> To show the Plan is fair and equitable, Frontline must prove, as of the effective date of the plan, "the plan provides that all of the projected disposable income of the debtor to be received in the 3-year period, or such longer period not to exceed 5 years as the court may fix, beginning on the date that the first payment is due under the plan will be applied to make payments under the plan."[50]

Applying those standards, the Bankruptcy Court found the Plan was fair and equitable for purposes of subchapter V stating: "Frontline proposes to pay its creditors 100% of its projected disposable income over five years. . . . 100% of any extra cash or profits from extraordinary orders will be distributed to creditors, as well as any unused reserve. Frontline has satisfied the second part of § 1191(b)."[51]

---

[47] 11 U.S.C. § 1191(c).

[48] *In re Pearl Res. LLC*, 622 B.R. 236, 269 (Bankr. S.D. Tex. 2020) (observing § 1191(c)(3) is what is commonly referred to as the "feasibility test" in subchapter V).

[49] Order at 19, *in* Appellant's App. at 2167.

[50] *Id.* at 20, *in* Appellant's App. at 2168.

[51] *Id.*

Appellant contends the Bankruptcy Court did not apply the correct legal standard when analyzing the feasibility of the Plan. Specifically, Appellant notes § 1129(a)(11) is the standard only when the proposed plan is consensual; however, if the plan is nonconsensual, a proposed plan must also meet the requirements under § 1191(c)(3).

Frontline asserts § 1191(c)(3)(A) provides a nonconsensual plan is feasible if the debtor will be able to make all payments under the plan. Thus, it contends the Bankruptcy Court did not err because Appellant did not present evidence that Frontline would not be able to meet that requirement.[52]

Despite the Bankruptcy Court's detailed analysis under § 1129(a) and language concluding the Plan was fair and equitable, the Bankruptcy Court did not conduct an analysis under § 1191(c)(3). Namely, it did not explicitly find that Frontline would be able to make all payments under the Plan *or* that there is a reasonable likelihood that it would be able to make all payments *and* the Plan provides for appropriate remedies if payments are not made. That feasibility finding is a requirement to find a plan is fair and equitable for purposes confirmation under subchapter V. Accordingly, this Court remands this issue to the Bankruptcy Court to conduct an analysis applying the correct legal standard.[53]

---

[52] Frontline also noted it commenced making payments under the Plan, and in fact paid the Trustee the full amount projected to be paid over the life of the Plan.

[53] Appellant asserts that if the Bankruptcy Court had analyzed the Plan under § 1191(c)(3), then it would have found the plan is not feasible because (i) it was not reasonably likely Frontline would be able to make all plan payments and (ii) the Plan failed to provide adequate remedies. Because we are remanding the feasibility issue to the Bankruptcy Court for further findings, the Court declines to address those arguments.

20

## V.    Conclusion

For the foregoing reasons, we conclude the Bankruptcy Court did not clearly err by concluding Frontline did not exhibit bad faith in filing its bankruptcy petition or in proposing its plan. Additionally, we conclude the Bankruptcy Court did not abuse its discretion in denying the Motion to Dismiss. However, we REVERSE the Bankruptcy Court's decision confirming the Plan—the Bankruptcy Court did not apply the correct legal standard in analyzing feasibility for a nonconsensual plan proposed under subchapter V because there are no specific findings under either § 1191(c)(3)(A) or § 1191(c)(3)(B). Thus, we REMAND this issue to the Bankruptcy Court for further findings consistent with this opinion.